IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

EDWIN GENARO RIVERA DERAS,
and HUMBERTO GOMEZ
VALDOVINOS,

Defendants.

CASE NO. 1:19-CR-00508-AT-LTW

## FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This matter is presently before the Court on two Motions to Suppress Evidence ([Docs. 37, 38]) and a Motion to Suppress Statements ([Doc. 39]) filed by Defendant Edwin Genaro Rivera Deras ("Rivera Deras"), as well as a Motion to Suppress Evidence ([Doc. 40]) and a Motion to Suppress Statements ([Doc. 41]) filed by Defendant Humberto Gomez Valdovinos ("Gomez Valdovinos").  On July 1, 2020, the undersigned held a hearing regarding the Motions in compliance with Jackson-Denno[1].  At the hearing, the parties agreed that Defendant Rivera Deras's Motion to Suppress evidence recovered from a vehicle was moot because the Government indicated it will

---

[1] Jackson v. Denno, 378 U.S. 368 (1964)

not use any evidence recovered from the vehicle.  [Doc. 54 at 4, 75–76].  After the hearing, Defendants filed additional briefs in support of their other Motions ([Docs. 58, 59, 60]), the Government filed its Responses ([Docs. 62, 63]).  The Motions are ripe for consideration and, for the reasons outlined below, the undersigned **RECOMMENDS** that the Motions be **DENIED**.  [Docs. 37, 38, 40, 41].

## BACKGROUND

On November 12, 2019, Magistrate Judge Janet F. King issued a search warrant to search a particular Lake Colony Apartment for, *inter alia*, methamphetamine, bulk currency, and cellular phones (the "Apartment Search Warrant").  [Doc. 37-2].  In support of his application for the Apartment Search Warrant, Drug Enforcement Administration ("DEA") Task Force Officer ("TFO") David Mishoe submitted an affidavit containing facts to support a finding of probable cause.  [Doc. 37-1].  In the affidavit, TFO Mishoe explained that the Georgia Bureau of Investigation ("GBI") received information from a confidential informant who told the GBI that Rodolfo Ortiz—an inmate at the Jenkins Correctional Facility—was using a contraband cellphone to facilitate methamphetamine drug transactions.  [Id. ¶12].  An undercover GBI agent spoke with Ortiz, discussing a price per kilogram of $5,000 and the fact that Ortiz had five drug stash locations in the metro Atlanta area.  [Id. ¶13].

2

On October 17, 2019, an undercover DEA agent also spoke with Ortiz, planning a methamphetamine deal that occurred in Norcross.  [Id. ¶14].  Then, on October 28, 2019, the DEA undercover again spoke with Ortiz and planned a 500-gram methamphetamine deal to take place in Atlanta.  [Id. ¶15].  That deal occurred on November 6, 2019,[2] and was observed by DEA agents.  [Id. ¶16].  Two unknown Hispanic males approached the undercover's vehicle, and the undercover spoke with one of the suspects.  [Id. ¶¶16–18].  The second suspect then handed the first suspect a white plastic grocery bag, which the first suspect gave to the undercover in exchange for $2,500.  [Id. ¶18].  The suspects left and were followed by agents to the Lake Colony Apartments.  [Id. ¶¶19–20].  Agents surveilled the apartment building and later saw one of the suspects exit the apartment that was the subject of the Apartment Search Warrant.  [Id. ¶¶20–21].

On November 14, 2019, at approximately 6:00 a.m., DEA agents conducted a search of the Lake Colony apartment pursuant to the Apartment Search Warrant. [Doc. 54 at 8].  All agents were wearing vests and patches that clearly identified them

---

[2] TFO Mishoe's initial affidavit incorrectly listed the date as November 7, 2019. [Doc. 37-1 ¶16].  In an affidavit in support of a second warrant, discussed below, TFO Mishoe explained that the date of this second drug deal was actually November 7, 2019. [Doc. 37-3 ¶16]; see also [id. n.1].

as "DEA" and "police." [Id. at 9]. The agents knocked on the door, announced their presence and waited for someone to answer the door. [Id.]. Instead, Defendant Gomez Valdovinos went out onto the balcony on the side of the apartment, and the agents commanded him to stay where he was. [Id. at 10]. The agents then breached the door with a battering ram. [Id. at 9–10].

When the agents entered the apartment, they saw Defendant Rivera Deras standing near the kitchen. [Id. at 10]. TFO Mishoe testified that Defendants are "very limited in their ability to speak English" ([id. at 8]), so Defendant Rivera Deras was instructed in Spanish and told to walk toward the agents. [Id. at 9–10]. The agents' weapons were drawn and pointed towards Defendant Rivera Deras at this time. [Id. at 28]. The agents also pointed their weapons in Defendant Gomez Valdovinos's direction as they instructed him to come back inside from the balcony. [Id.]. Both Defendants complied, and both were placed in handcuffs and taken to a breezeway outside while the agents conducted a protective sweep of the apartment. [Id. at 10–11]. During the sweep, agents discovered a third individual in the very last bedroom. [Id. at 11]. The third individual was also placed in handcuffs and taken outside. [Id. at 11–12]. Once all three individuals were in handcuffs, the agents put away their weapons. [Id. at 12].

4

After the protective sweep, Defendants were brought back inside where they sat on chairs in the living room.  [Id. at 16].  Approximately 30 to 45 minutes after the agents breached the apartment, Defendants were interviewed by Special Agent Evaristo Cedeno—a native Spanish speaker.  [Id. at 16–17]; see also [id. at 50].  Agent Cedeno testified that he interviewed Defendant Gomez Valdovinos first, and that he read Defendant Gomez Valdovinos a Miranda[3] warning in Spanish from a preprinted card.  [Id. at 51].  After reading each right listed on the card, Agent Cedeno would ask Defendant Gomez Valdovinos if he understood the right, and each time Defendant Gomez Valdovinos verbally indicated that he understood his rights.  [Id at 52–53].  Defendant Gomez Valdovinos did not ask any questions regarding his rights, did not hesitate in indicating that he understood the rights, and did not appear confused about his rights.  [Id. at 53–54].

During Agent Cedeno's brief interview of Defendant Gomez Valdovinos, he was standing approximately a foot or two away from Defendant Gomez Valdovinos, who was seated.   [Id. at 54–56].   Agent Cedeno's weapon was holstered during the interview; and Agent Cedeno did not yell at Defendant Gomez Valdovinos, did not

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

5

threaten him, did not confront him with evidence, did not attempt to coerce him, and did not deny him any basic comforts like food, water, or a bathroom break.  [Id. at 54–55].

Agent Cedeno also interviewed Defendant Rivera Deras, reading him a Miranda warning in Spanish just like he did for Defendant Gomez Valdovinos.  [Id. at 56]. Defendant Rivera Deras did not seem confused, intoxicated, or unstable and did not ask any questions about his rights, verbally indicating that he understood them.  [Id. at 56–57].  Again, Agent Cedeno's weapon was holstered during the interview; and Agent Cedeno did not yell at Defendant Rivera Deras, did not threaten him, did not physically harm him, did not attempt to coerce him, and did not deny him any basic comforts like food, water, or a bathroom break.  [Id. at 56–57].  Agent Cedeno's interview of Defendant Rivera Deras was brief, lasting only three to five minutes because Agent Cedeno believed Defendant Rivera Deras was not forthcoming with his answers.  [Id. at 57–58].

Although TFO Mishoe does not speak Spanish, he observed both interviews. [Id. at 17–20].  TFO Mishoe confirmed that Agent Cedeno read Defendants a Miranda warning in Spanish, and that Defendants did not seem confused or intoxicated.  [Id.]. According to TFO Mishoe, Defendants were calm, cooperative, and compliant.  [Id.].

6

TFO Mishoe also confirmed that Agent Cedeno did not draw his weapon, raise his voice, or otherwise appear to threaten Defendants during the brief interviews.  [Id.].

On November 26, 2019, the undersigned issued a search warrant authorizing the search of three cellular telephones seized during the search of the apartment (the "Cellphone Search Warrant").  [Doc. 37-4].  In support of his application for the Cellphone Search Warrant, TFO Mishoe submitted an affidavit detailing the events leading up to the November 14, 2019 search.  [Doc. 37-3 ¶¶12–22].  The affidavit then explained that the November 14, 2019 search revealed a white plastic bag containing suspected methamphetamine, a 9mm pistol, and approximately $38,000 in cash hidden under the carpet and in a hallway closet.  [Id. ¶¶23–25].  Two of the cellphones were located in Defendant Rivera Deras's bedroom, where the agents discovered the majority of the cash.  [Id. ¶27]; see also [id. ¶24].  The third cellphone to be searched was located on Defendant Gomez Valdovinos's person and surrendered to Agent Cedeno.  [Id. ¶27].  Because Ortiz used a contraband cellphone from prison to coordinate the drug sales, and based on the drugs, gun, and cash found in the apartment, TFO Mishoe asserted that there was probable cause to believe the seized cellphones were used to facilitate drug trafficking and asked to search as far back as three months from the date of Defendants' arrests.  [Id. ¶¶27–28].

7

## DEFENDANTS' MOTIONS TO SUPPRESS

**A.** **The Search Warrants**

In order to be valid, a search warrant must be supported by probable cause, which exists "when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). An affidavit in support of a search warrant must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted). This requires "a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." Id. When reviewing an affidavit to determine if it contains probable cause, the entire affidavit must be read together "as a whole." See United States v. Reed, 700 F.2d 638, 641 (11th Cir. 1983).

When reviewing a search warrant, courts do not "conduct a de novo determination of probable cause." Massachusetts v. Upton, 466 U.S. 727, 728 (1984). The reviewing court's role is "only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." Id. This is "a practical, commonsense decision," and courts are not to "interpret supporting affidavits

in a hypertechnical manner." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994). Courts want "to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." Id.; see also United States v. Robinson, 62 F.3d 1325, 1331 (11th Cir. 1995) (requiring the reviewing court to afford "great deference" to a judicial determination of probable cause).

Defendant Rivera Deras argues the affidavit in support of the Apartment Search Warrant fails to establish probable cause because it does not explicitly say he sold drugs to the undercover, instead simply stating that he "turned over a plastic bag in exchange for money." [Doc. 37 at 5]. Defendant Rivera Deras further contends that the affidavit fails to link the apartment itself to the alleged criminal activity. [Id.]. As for the Cellphone Search Warrant, Defendant Rivera Deras asserts that TFO Mishoe's affidavit "does not provide any evidence that Mr. Rivera Deras used a phone to engage in illegal activity." [Id. at 5–6].

Defendant Gomez Valdovinos likewise makes much ado about the fact that TFO Mishoe's affidavit in support of the Apartment Search Warrant does not explicitly say that the plastic bag handed to the undercover contained drugs. [Doc. 40 at 8]. Defendant Gomez Valdovinos also argues the affidavit fails to support probable cause

because it does not provide details about what apartment Defendants were seen entering, about prior surveillance of the apartment, about tips concerning drug activity at the location. [Id. at 8–9]. Then, Defendant Gomez Valdovinos asserts the information in the "search warrant application was stale" because the application was submitted six days after the November 6, 2019 drug transaction. [Id. at 9–10]. Last, Defendant Gomez Valdovinos contends that the Cellphone Search Warrant lacked probable cause for the same reasons as well as the fact that the affidavit contained no information connecting the cellphone found on Defendant Gomez Valdovinos to the illegal drug activity. [Id. at 11].

In response, the Government argues the Apartment Search Warrant was based on probable cause because the application clearly established a connection between the apartment and the November 6, 2019 drug transaction. [Doc. 61 at 8–9]. The Government further contends that the information in the application was not stale because: (1) the investigation involved "an ongoing drug conspiracy involving numerous transactions over time," (2) the items sought were "likely to be maintained for long periods of time," and (3) the nature of the place to be searched—a residence— makes it more likely that the items would remain there. [Id. at 11–12]. As for the Cellphone Search Warrant, the Government asserts that TFO Mishoe's affidavit

adequately explains the connection, pointing to the fact that Ortiz used a cellphone to facilitate the drug transactions.  [Id. at 12–13].  Finally, the Government argues the Leon[4] good faith exception would apply, even if the warrants were otherwise invalid. [Doc. 61 at 13–15].

The Court agrees with the Government.  In arguing that there was no probable cause for the Apartment Search Warrant, both Defendants rely on the fact that the affidavit in support of the application for that warrant did not explicitly say the white plastic bag handed to the undercover contained drugs.  [Doc. 37 at 5]; [Doc. 40 at 8]. But the affidavit must be read together "as a whole."  See Reed, 700 F.2d at 641. Magistrate Judge King was also allowed to make "common-sense conclusions about human behavior" in assessing whether probable cause existed.  Illinois v. Gates, 462 U.S. 213, 231–32 (1983) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). Looking at the affidavit as a whole and using common-sense, Magistrate Judge King would have readily understood TFO Mishoe's affidavit to be asserting that the white plastic bag contained methamphetamine.

_____

[4] United States v. Leon, 468 U.S. 897 (1984).

Ortiz and an undercover GBI agent discussed a price of $5,000 per kilogram of methamphetamine. [Doc. 37-1 ¶13]. Then, an undercover DEA agent spoke with Ortiz and planned a 500-gram methamphetamine deal. [Id. ¶15]. Two Hispanic males—later identified as Defendants—appeared at the agreed upon location for the drug deal and approached the undercover's vehicle. [Id. ¶16]. The suspects then handed the undercover DEA agent a white plastic grocery bag in exchange for $2,500, which happened to be the exact price for the 500 grams of methamphetamine the undercover had arranged to buy. [Id. ¶18]. Using one's common sense, the inescapable conclusion is that the white plastic grocery bag contained the 500 grams of methamphetamine the undercover planned to buy from Ortiz and his associates.

Defendants' other arguments fair little better. They both contend that TFO Mishoe's affidavit "fails to link the apartment to any criminal activity." [Doc. 37 at 5]; see also [Doc. 40 at 8–9]. But the affidavit clearly states that Defendants were followed from the scene of the drug deal to the Lake Colony apartments, with Defendant Rivera Deras later seen exiting the apartment that was the subject of the Apartment Search Warrant. [Doc. 37-1 ¶¶19–21]. Using her common sense, Magistrate Judge King could have readily concluded that the apartment would contain evidence of Defendants' alleged drug trafficking activities, such as the $2,500 they had just received from the

undercover DEA agent.  See United States v. Green, 634 F.2d 222, 226 (5th Cir. 1981) ("The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained.").[5]   Additionally, Ortiz told the undercover GBI agent that he had "drug stash locations in the metro Atlanta area," further bolstering the conclusion that the apartment would contain additional methamphetamine.  [Id. ¶13].  Certainly, the affidavit established a fair probability of finding the itemized contraband or evidence at the identified apartment, and thus the Apartment Search Warrant was supported by probable cause.  See Kapordelis, 569 F.3d at 1310.

The only other argument regarding the Apartment Search Warrant is Defendant Gomez Valdovinos's contention that the information in the "search warrant application was stale."  [Doc. 40 at 9–10].  As the Government rightly argues, the fact that the investigation at issue involved an ongoing drug conspiracy weighs heavily against a

---

[5] Fifth Circuit cases decided on or before September 30, 1981, are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981).

finding of staleness. See United States v. Harris, 20 F.3d 445, 451 (11th Cir. 1994) ("Although most of the information contained in the affidavit referred to events which took place over two years before [the DEA agent] applied for the warrant, the affidavit nonetheless alleged a longstanding and protracted criminal conspiracy."). Likewise, the nature of the place to be searched, a personal residence, made it more likely that Defendants and the evidence of their alleged crimes would still be in the location a week later. See United States v. Bervaldi, 226 F.3d 1256, 1266 (11th Cir. 2000) (holding "that it was reasonable for the officers to believe that the residency extended for at least 6 months and 21 days"). Considering the totality of the circumstances, the undersigned concludes that substantial evidence in the record supports Magistrate Judge King's decision to issue the Apartment Search Warrant. See Upton, 466 U.S. at 728.

Likewise, the Cellphone Search Warrant was also supported by adequate probable cause. For the reasons given above, the Court rejects Defendants' arguments that the Apartment Search Warrant was deficient, and thus also rejects Defendants' argument that the Cellphone Search Warrant lacked probable cause because it was based, in part, on information from the prior application. See [Doc. 40 at 11]. Otherwise, Defendants simply contend that the information in the subsequent

14

application did not contain information connecting the cellphones to illegal activity. [Doc. 37 at 6–7]; [Doc. 40 at 11].

As TFO Mishoe explained, Ortiz used a contraband cellphone to orchestrate numerous drug transactions from prison.  [Doc. 37-3 ¶¶12–16].  Defendant Rivera Deras argues that just because Ortiz communicated with undercovers and a covert informant using a cellphone, "it does not follow that Mr. Rivera Deras was doing the same." [Doc. 37 at 5].  But the affidavit explains that the undercover DEA agent told Ortiz of his/her location on November 6, 2019, "via telephone," and Ortiz presumably communicated that information to Defendants who arrived at the location sometime thereafter.  [Doc. 37-3 ¶16].  Common-sense suggests Ortiz used the cellphone that he had just used when communicating with the undercover.  The affidavit in support of the Cellphone Search Warrant did not need to establish with absolute certainty that the cellphones were used as part of the trafficking conspiracy.  Instead, the affidavit only needed to establish "a fair probability" that the cellphones contained evidence of the drug trafficking conspiracy.  Brundidge, 170 F.3d at 1352.

Defendants also argue the cellphones were "not located near illegal contraband," but this argument is unpersuasive.  [Doc. 40 at 11]; see also [Doc. 37 at 6].  While the two cellphones in Defendant Rivera Deras's bedroom were not in the same room as the

drugs, they were in the same room as huge amounts of concealed cash. See [Doc. 37-4 ¶¶24, 27]. Also, the fact that Defendant Gomez Valdovinos's cellphone was on his person as he was arrested for drug trafficking hardly defeats a finding of probable cause. Considering the totality of the circumstances, the undersigned concludes that substantial evidence supported a finding of probable cause to issue the Cellphone Search Warrant. See Upton, 466 U.S. at 728.

Moreover, even if either warrant lacked probable cause, Defendants would not be entitled to exclusion of any evidence because law enforcement acted "in objectively reasonable reliance" on the warrants. See Leon, 468 U.S. at 922. The exclusionary rule "is not an individual right." Herring v. United States, 555 U.S. 135, 141 (2009). It is a "last resort" whose "sole purpose" is "to deter future Fourth Amendment violations." United States v. Smith, 741 F.3d 1211, 1219 (11th Cir. 2013). As such, unless "a reasonably well trained officer would have known that the search was illegal," the evidence will not be excluded. Leon, 468 U.S. at 922 n.23. As discussed above, the search warrants at issue *were* supported by adequate probable cause. But as the Government persuasively argues, even if they were not, the Leon good faith exception would apply. See [Doc. 61 at 13–15].

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendants' Motions to Suppress the evidence seized pursuant to the Apartment Search Warrant and the Cellphone Search Warrant ([Docs. 37, 40]) be **DENIED**.

## B.    Defendants' Statements

For Defendants' statements to be admissible, the Government bears the burden of showing both that (1) the statements were made voluntarily; and (2) the statements were not made in violation of Miranda.  Jarrell v. Balkcom, 735 F.2d 1242, 1252 (11th Cir. 1984); see also United States v. Lall, 607 F.3d 1277, 1285 (11th Cir. 2010) ("The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary.").  Defendants contend that their statements were both involuntary and made in violation of Miranda, so the Court addresses each issue in turn.  See [Doc. 59 at 7–17]; [Doc. 60 at 7–13].

### 1.    Whether Defendants' Statements were Voluntary

A defendant's statement is involuntary if the totality of the "circumstances show that 'coercive police activity' overcame the defendant's free will."  Arvelo v. Sec'y, Fla. Dep't of Corr., 687 F. App'x 901, 904 (11th Cir. 2017) (quoting Colorado v. Connelly, 479 U.S. 157, 163–64 (1986)).  A non-exhaustive list of factors to be considered in assessing whether a defendant's statements are voluntary includes: the

17

age of the accused, his level of education, his intelligence, whether the accused was advised of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.  Schneckloth v. Bustamonte, 412 U.S. 218, 226–27 (1973); see also 18 U.S.C. § 3501(b) (listing factors to be considered in determining if a confession was voluntarily given).  A determination that a defendant's statements were involuntary "must include an element of official overreaching."  Miller v. Dugger, 838 F.2d 1530, 1536 (11th Cir. 1988).  "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession."  Id.

As an initial matter Defendant Rivera Deras contends that "the testimony of Agent Cendo . . . is not credible" due to certain contradictions between his testimony and the testimony of TFO Mishoe.  [Doc. 59 at 11–12].  Because Agent Cendo and TFO Mishoe were the only two witnesses to testify at the Jackson-Denno hearing, their credibility is crucial, and the Court addresses this argument first.  Defendant Rivera Deras is correct that the testimony of the officers was not consistent on every single fact, but the Court finds both witnesses' testimony credible because the inconsistencies

identified by Defendant Rivera Deras are minor, somewhat irrelevant, and easily explained.

First, TFO Mishoe testified that Defendant Rivera Deras was the first individual instructed to walk toward the officers, while Agent Cendo testified that Defendant Gomez Valdovinos "came out first." [Doc. 54 at 10, 68]. But the inconsistency can be explained by Agent Cendo's testimony that there "was a lot of confusion at first" when the officers entered the apartment. [Id. at 67]. In any event, Defendant Rivera Deras does not explain how the inconsistency regarding this minor detail is relevant to either witnesses' testimony about the interviews that occurred 30 to 45 minutes after the officers breached the door. See [Doc. 59 at 11–12].

Second, TFO Mishoe testified that Defendant Rivera Deras was interviewed first, but Agent Cedeno testified that Defendant Gomez Valdovinos was interviewed first. [Doc. 54 at 17, 51]. Again, this inconsistency is easily explained by the fact that TFO Mishoe readily admitted he was "not a hundred percent sure" who was interviewed first. [Id. at 17]. In any event, this minor detail barely impacts either witnesses' testimony, since both interviews were essentially identical. See [Id. at 17–20, 51–57]. Nothing in either witnesses' testimony indicates the inconsistency is anything other than an innocent lapse in memory on behalf of one of the witnesses.

Third, Defendant Rivera Deras points to the fact that TFO Mishoe testified that Agent Cedeno was not providing a direct translation of the interviews, while Agent Cedeno testified he translated "in real[-]time."  [Doc. 54 at 42, 68].  This too appears to be explained by the fact that TFO Mishoe could not recall whether he was heard the entirety of the interviews.  [Id. at 41].  Also, to the extent the testimony is truly inconsistent, it again seems to be an innocent lapse in memory.  If TFO Mishoe had testified that he *did* understand the interviews because they were translated for him, he might plausibly be attempting to bolster the testimony of Agent Cedeno.  But because TFO Mishoe stated that the interviews *were not* directly translated, TFO Mishoe did not bolster Agent Cedeno's testimony of exactly what was said.  Instead, TFO Mishoe was limited to testifying about what "seemed to be" happening.  See [id. at 18–20].

To the extent the witnesses' testimony is truly inconsistent, those inconsistencies are not relevant to the Court's analysis below and thus need not be resolved by the Court.  Having considered the testimony of the witnesses, the undersigned finds them both to be credible, despite the minor inconsistencies pointed out by Defendant Rivera Deras.

Turning to the core of Defendants' argument that their statements were involuntary, both Defendants rely heavily on the fact that a dozen officers were present

to execute the Apartment Search Warrant and that the officers breached the door with weapons drawn, shouting commands to Defendants.  See [Doc. 59 at 9–10]; [Doc. 60 at 9–10].  The officers' actions were not unusual during the execution of a search warrant, especially when the occupants refuse to answer the door and appears to have been trying to escape off a balcony.  Crucially, those things happened a full 30 to 45 minutes before Defendants were interviewed.  [Doc. 54 at 16–17].  By the time Defendants were interviewed, all the officers' weapons were holstered, and they remained holstered throughout the interviews.  See [id. at 12]; see also [id. at 54–57].  While other officers—such as TFO Mishoe—were in the apartment during the interviews, only Agent Cedeno interviewed Defendants.  See [id. at 51–57]; see also [id. at 17–20].

Defendants also argue their statements were involuntary because there is no evidence regarding their education level, how long they had been in the United States, or their familiarity with the American legal system, and because they do not speak English.  See [Doc. 59 at 10–11]; [Doc. 60 at 10–11].  While Defendants' cultural background may have rendered them more vulnerable to potential coercive police conduct, there is simply no evidence the officers actually engaged in such coercive conduct to exploit Defendants' inability to speak English or their lack of familiarity

with the American legal system.  Defendants were not interviewed in English.  They were interviewed in Spanish by a native Spanish speaker, and there is no evidence that Defendants' had any trouble communicating with Agent Cedeno.  See [Doc. 54 at 50–57].  As will be discussed in more detail below, Agent Cedeno clearly and adequately explained Defendants' rights to them, indicating their subsequent statements were voluntary.  See [id. at 52–54, 56–57]; see also Schneckloth, 412 U.S. at 226; 18 U.S.C. § 3501(b)(3), (4).  Defendant Gomez Valdovinos argues there "is scant evidence [he] actually understood what was being read to him by Agent Cedeno," but the fact that he verbally indicated he understood each and every one of the rights without hesitation and the fact that he had no confusion or questions about his rights is abundant evidence he understood the rights being explained to him.  [Doc. 60 at 10–11]; see also [Doc. 54 at 52–54].

The Court agrees with the Government that the totality of the circumstances shows that Defendants' statements were voluntary.  [Doc. 62 at 6–10].  Neither Defendant was physically harmed or threatened in any way.  [Doc. 54 at 17–20, 54–57].  No one raised their voice during the interviews.  [Id. at 19, 55, 57].  The interviews themselves were short, lasting only "a few minutes."  [Id. at 19–20]; see also [id. at 57, 64].  Given the brevity of the interviews, the Defendants were not denied any

comforts—such as food, water, or a bathroom break—during the interviews.  [Id. at 54–57].   And as mentioned above and discussed more below, Defendants were adequately advised of their rights.  [Id. at 52–54, 56–57].  Considering the totality of the circumstances, the facts of this case are not the kind of coercive police conduct that would render Defendants' statements involuntary.  See, e.g., Beecher v. Alabama, 389 U.S. 35, 36–37 (1967) (holding a confession obtained after the defendant was shot in the leg was involuntary because one of the officers threatened to kill the defendant and the other officer fired a rifle next to the defendant's ear); Mincey v. Arizona, 437 U.S. 385, 398–401 (1978) (holding a confession was involuntary where the hospitalized defendant was interrogated for four hours, even though he repeatedly asked the officer to stop until he could get a lawyer); see also Arvelo, 687 F. App'x at 904 (holding a twenty-one year old defendant's confession was voluntary even though he was under arrest and interrogated for three hours because the officers did not physically coerce the defendant, deprive him of any essential needs, or threaten him in any way and the defendant did not "ever say he was tired or unwilling or unable to proceed").

### 2.     *Whether Defendants' Statements were made in Violation of Miranda*

Even if the officers did not engage in coercive conduct that rendered Defendants' statements involuntary, the Government still must show Defendants knowingly and

intelligently waived their rights by speaking with law enforcement.  See United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994); see also Agee v. White, 809 F.2d 1487, (11th Cir. 1987) (holding that a suspect "must have been aware of both the nature of the right being abandoned and the consequences of the decision to abandon it").  Here, Agent Cedeno advised Defendants of both the rights they would abandon by speaking with law enforcement and the consequences of abandoning those rights, as required by Miranda.  [Doc. 54 at 51–53, 56].  The only question, then, is whether Defendants adequately understood Agent Cedeno's Miranda warning.

Defendant Rivera Deras argues there is "nothing in the record that suggests [he] was given an opportunity to ask questions about his rights," and that Agent Cedeno did not "do anything to assess Mr. Rivera Deras's understanding of his rights." [Doc. 59 at 16].  Both arguments are incorrect.  Agent Cedeno explicitly asked Defendant Rivera Deras if he understood the rights being explained to him after reading every right and the consequence of abandoning it.  See [Doc. 54 at 56].  In doing so, Agent Cedeno gave Defendant Rivera Deras an opportunity to ask questions about each right if he did not understand his rights or the questions.  It appears that Defendant Rivera Deras chose not to ask any questions.  [Id.].  Instead, Defendant Rivera Deras verbally indicated

that he understood all of the rights, which is strong evidence that he did in fact understand them.  [Id.].

The fact that the record contains no evidence regarding Defendant "Rivera Deras's level of education or his experience with the justice system" does not supports his contention that his waiver of rights was not intelligently made.  See [Doc. 59 at 16]. Nothing in the record indicates Defendant Rivera Deras's education level or lack of familiarity with the justice system impeded his ability to understand the rights being explained to him by a native Spanish speaker.  As noted above, Defendant Rivera Deras verbally acknowledged he understood the rights and asked no questions about them. See [Doc. 54 at 56].  Agent Cedeno also personally observed Defendant Rivera Deras during the Miranda warning, and he testified that Defendant Rivera Deras did not appear to be confused, intoxicated, or emotionally unstable.  [Id. at 56–57].

Likewise, Defendant Gomez Valdovinos was advised both the rights he would abandon by speaking with law enforcement and the consequences of abandoning those rights.  [Id. at 51–53].  Defendant Gomez Valdovinos also was asked if he understood each and every right, and he verbally indicated that he did.  [Id.].  Defendant Gomez Valdovinos was not confused, did not ask any questions about his rights, and did not hesitate in indicating he understood the Miranda warning.  [Id. at 53–54].  Nothing in

the record supports Defendant Gomez Valdovinos's speculation that "his level of education or his experience with the justice system" might have somehow hampered his ability to understand rights being explained to him in Spanish. See [Doc. 60 at 11]. Furthermore, Defendant Gomez Valdovinos's argument that the Miranda warning card "could be confusing" is irrelevant because, as he admits, there is no evidence he [Defendant Gomez Valdovinos] ever saw the card. [Id. at 12–13]. Even if the card itself was confusing, Agent Cedeno did not simply give the card to Defendant Gomez Valdovinos or place it in front of him and expect him to understand it. Again, Agent Cedeno advised Defendant Gomez Valdovinos of each right and the consequences of abandoning it, and Agent Cedeno ensured Defendant Gomez Valdovinos understood everything being explained to him. [Doc. 54 at 51–53].

Defendants knowingly, intelligently, and voluntarily waived their rights by speaking with law enforcement. As such, their statements are admissible, and the undersigned **RECOMMENDS** that their Motions to Suppress Statements ([Docs. 39, 41]) be **DENIED**.

## CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendants'

Motions ([Docs. 37, 38, 39, 40, 41]) be **DENIED**.[6]  There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.  **IT IS FURTHER ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

      **SO ORDERED, REPORTED, AND RECOMMENDED**, this ___9___ day of October, 2020.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

---

[6] As noted above, the parties agree that Defendant Rivera Deras's Motion to Suppress evidence recovered from a vehicle ([Doc. 38]) is MOOT because the Government indicated it will not use any evidence recovered from the vehicle. [Doc. 54 at 4, 75–76].